**FOOD FAIR STORES, INC., a corporation, Appellant,**

v.

**LAKELAND GROCERY CORP., a corporation, Appellee.**

**No. 8397.**

United States Court of Appeals Fourth Circuit.

Argued Jan. 5, 1962.

Decided March 22, 1962.

Lewis T. Booker and Archibald G. Robertson, Richmond Va. (Hunton, Williams, Gay, Powell & Gibson, Richmond, Va., and Stein, Stein & Engel, Jersey City, N. J., on the brief) for appellant.

Norris E. Halpern and William L. Parker, Norfolk, Va., for appellee.

Before SOPER, BRYAN and BELL, Circuit Judges.

SOPER, Circuit Judge.

Food Fair Stores, Inc., the plaintiff below, appeals from an order of the District Court dismissing its complaint for injunctive relief and for an accounting of profits, and permanently enjoining it, upon the counterclaim of Lakeland Grocery Corporation, defendant below, from using the trade name FOOD FAIR in the operation of its retail grocery business in the Norfolk-Portsmouth area of Virginia. The sole question presented is which of the two parties is entitled to the exclusive use of the trade name FOOD FAIR in the area. The District Court concluded, notwithstanding the earlier use of the name FOOD FAIR by the plaintiff as the designation for its chain of retail grocery stores in various areas of the United States that the defendant, Lakeland, by reason of its use of the name for its retail outlet in the Norfolk-Portsmouth area prior to any competitive activity there by Food Fair Stores, was entitled to the exclusive use of the trade name in that area. The correctness of this conclusion depends upon the applicable principles of the Virginia common law of unfair competition.[1]

At the time of the trial below, September 1959, Lakeland operated two supermarkets in the Norfolk-Portsmouth area under the name FOOD FAIR. One was opened in May 1953, the other in July 1959. Food Fair Stores' FOOD FAIR supermarkets in the area numbered three. The first was opened in January 1958, and the others in 1958 and 1959 respectively. Lakeland is a Virginia Corporation, incorporated in May 1953, whose activities are limited to the Norfolk-Portsmouth area. Food Fair Stores, on the other hand, at the time of trial was the sixth largest chain food store organiza-

---

1. Jurisdiction below was based on diversity of citizenship. In addition, the complaint originally asserted violations of the Lanham Trademark Act, 15 U.S.C.A. §§ 1051–1121, and of the Virginia statute relating to trade marks, but these contentions were abandoned during the course of the trial. The question of damages, demanded by the counterclaim of Lakeland, was not finally decided by the District Court. The claim for compensatory damages was reserved for further consideration, but the claim for punitive damages was denied.

tion in the country, with 399 retail stores in 9 eastern states distributed as follows: Connecticut 8; Delaware 8; Florida 120; Georgia 3; Maryland 41; New Jersey 79; New York 40; Pennsylvania 94; Virginia 6. Its retail sales in stores bearing the FOOD FAIR name for 53 weeks ending May 2, 1959, totaled $589,-892,682; and the amount spent on advertising from 1935 when the FOOD FAIR name was first used by it, aggregated $30,234,148, of which $2,458,004 was expended in the first eight months of 1959.

The origins of this vast corporate business go back to a predecessor which was formed in the 1920's by the merger of several small groups of grocery and meat stores operating in and around Harrisburg, Pa. In the early 1930's its officers evolved or adopted the concept of the self-service supermarket—a store with convenient parking and accessibility to arterial highways, wherein a full range of food products are available to customers at moderate prices resulting from large sales and rapid inventory turnover—and in 1933 it opened its first supermarket in Harrisburg under the name "Giant Quality Price Cutters, Inc." The success of the operation was such that by the end of 1935 it had opened eight supermarkets in Pennsylvania and southern New Jersey, and by the end of 1937, at which time 22 of its supermarkets were in operation, it had moved its home office to Philadelphia and had closed all of its small stores.

The name FOOD FAIR was first used by the predecessor in August 1935 when it incorporated a subsidiary corporation known as Food Fair Stores, Inc. under the laws of Maryland. On October 31, 1935 the subsidiary opened a supermarket in Baltimore, Maryland, and one day later an additional supermarket in New Jersey, under the FOOD FAIR name. By 1938 all of the supermarkets of the predecessor or its subsidiary were operated under the name FOOD FAIR; in 1939 the name FOOD FAIR was registered in the U. S. Patent Office as a trademark for butter and eggs, and in 1942 the prede-

cessor changed its corporate name to Food Fair Stores, Inc. At the same time, the listing of its stock, which had been traded through the New York Stock Exchange since 1937, was similarly changed to FOOD FAIR. From these beginnings Food Fair Stores continued its expansion until by April 1953, it operated 162 supermarkets in six states of which 156 operated under the name FOOD FAIR. As of that time there were 17 stores in New York, 45 in New Jersey, 52 in Pennsylvania, 4 in Delaware, 19 in Maryland, and 25 in Florida. During the year ending April 1953 Food Fair Stores had retail sales totaling $265,787,306. In the year 1952 $1,540,583 was expended in advertising and the total advertising expenditures from 1935 amounted to $9,918,269. Food Fair Stores was then the eighth largest chain of food stores in the United States, and the value of its good will measured by the market value of its stock in excess of its book value was $33,000,000.

At that time no FOOD FAIR Store was being operated by it in Virginia. The closest store to Norfolk, Virginia, was in Baltimore, Maryland. Two stores were being operated in the metropolitan area of Washington, D. C. under the name Food Lane to avoid confusion since the name FOOD FAIR had been earlier appropriated in the area by another operator. The reason for the step is made plain by the decision in Food Fair Stores v. Square Deal Market Co., 93 U.S.App.D.C. 7, 206 F.2d 482, where it was shown that approximately 18 weeks after the adoption of the name FOOD FAIR by the plaintiff, a store in Washington, D. C. was opened by Square Deal Market Co., Inc. under the same name without knowledge of the earlier adoption of the name by the plaintiff's predecessor. The court held that under the circumstances it was entitled to continue the use of the name and Food Fair Stores was enjoined from using it in that area.

On May 14, 1953, the defendant, Lakeland Grocery Corporation, opened its first supermarket in the Norfolk-Portsmouth area, using the name FOOD FAIR. Har-

old Eisenberg, the president of Lakeland, testified that prior to 1953 he knew that Food Fair Stores was an organization of chain stores on the East Coast that "had a lot of stores", and that he was also aware that there were many independently owned stores operating under the name FOOD FAIR, as in Washington, D. C., Richmond, and western Virginia [2], and that Food Fair Stores had no supermarkets under the name FOOD FAIR in Virginia. He stated that the name FOOD FAIR was selected for Lakeland's store since an establishment about a mile down the highway on which the store was located used the name "Furniture Fair" and it was thought that the highway would "become * * * made up of establishments that had a carnival-like or food fair operation" and that the FOOD FAIR designation would "tie-in" with such a scheme.

Shortly after the opening of the Lakeland supermarket, Food Fair Stores was advised of the fact, and on June 1, 1953 wrote Lakeland asserting its right to the exclusive use of the term FOOD FAIR as a trade name, and protesting Lakeland's use of the name. Thereafter, no further action was taken until 1956 when Food Fair Stores unsuccessfully tried to negotiate a purchase of the Lakeland store. In 1956 Food Fair Stores purchased a site outside of Norfolk on which it constructed a supermarket which was opened under the name FOOD FAIR on January 15, 1958, two days after the institution of this action. In June 1957 letters were exchanged in which Lakeland protested the prospective opening of this store and Food Fair Stores reasserted its prior right to use the name. In October 1957 a store was opened in Portsmouth using the name FOOD FAIR under license from Lakeland, and in July 1959 Lakeland opened another supermarket in Portsmouth under the FOOD FAIR name. Food Fair Stores in turn opened two addi-

tional stores in the area in 1958 and 1959 respectively, using the FOOD FAIR designation. Additional negotiations between the parties commencing in 1958 came to nought in 1959, and the trial of this case followed in September 1959.

At the trial it was stipulated that the style and size of the lettering of the signs on the stores was essentially similar so as to cause the average person viewing the signs to conclude that the stores were operated by the same organization, and the plaintiff sought to establish the right to exclusive use of the designation FOOD FAIR, founded on its prior adoption and long employment of the term as the trade name of its expanding chain store organization.

To show that the name FOOD FAIR was well and favorably known in the area and had attained a secondary meaning prior to the opening of its FOOD FAIR store by Lakeland, the plaintiff relied on its activities over a long period of years and the advertisement of its name as above described. It showed also that stores in the Norfolk area had been selling produce to Food Fair Stores for years long prior to 1953 and that its trucks prominently displaying the FOOD FAIR name made frequent trips there to pick up merchandise. And it pointed out that the region was a cosmopolitan area attracting people from all parts of the east coast who were familiar with the FOOD FAIR name and identified it with the plaintiff.

With respect to the reasonable probability of expansion of the Food Fair chain into the Norfolk-Portsmouth area in 1953 it was shown that the business continued to expand along the eastern seaboard until in September 1959 there were 399 stores located in the region extending from Connecticut to Florida, including six in operation in Virginia, with additional stores and a supply warehouse there then under construction. Pursuant to the plan

2. The District Court found that prior to Lakeland's use of the name FOOD FAIR, stores not owned by Food Fair Stores in Pulaski, Tazewell, Martinsville, and Richmond, Virginia, had used the name, the last from 1937 to 1957, and that other stores totaling 16 were being or had been operated independently under the name FOOD FAIR in North Carolina, Georgia, Alabama and Tennessee.

to extend the business a store was opened in Alexandria, Virginia, in 1946 but was unable to use the name FOOD FAIR because of the prior use of that name in the Washington area as above described, but thereafter the right to use the name was acquired by agreement in October 1960. The evidence showed that the program comprised the acquisition of existing stores in a given area until a sufficient number, usually fifteen, had been obtained whereupon a warehouse was built to supply them. Such a warehouse was completed in Baltimore in 1949 whereby the operation of stores in Norfolk became economically feasible. Efforts were made in 1955 to purchase a chain of stores in the neighborhood of Newport News and Hampton but these were unsuccessful, and in 1956 an unsuccessful effort was made to acquire the Lakeland store in Norfolk, failing which a site for a Food Fair Store in the Norfolk area was acquired by the plaintiff.

Upon this state of facts the District Judge held that the words FOOD FAIR constitute a trade name susceptible of appropriation and entitled to the protection of the courts, and that the president of Lakeland Grocery Corporation, the defendant, was well aware of the use of the name by the plaintiff to designate its far flung chain of supermarkets when the defendant, on May 14, 1953, opened its store in Norfolk under the same name. The Judge also noted that the defendant adopted for its store advertising signs substantially identical in style and size of lettering as used by the plaintiff on its stores; and that the defendant continued to operate its store under the plaintiff's name notwithstanding the fact that after it opened its store it received a letter from the plaintiff notifying it that since 1935 the plaintiff had operated a chain of supermarkets under the name and had widely advertised it so that it had become identified in the mind of the public with the plaintiff's business in the eastern and southern areas of the United States.

Nevertheless, the Judge dismissed the plaintiff's suit and granted the counter-claim of the defendant for an injunction against the plaintiff. He held that since the defendant was the first to use the name in the Norfolk-Portsmouth area it was entitled to its exclusive use therein, and that the subsequent entry of the plaintiff was an attempt on its part to capitalize on the advertising and good will which the defendant had brought about in the interval.

The Judge dismissed the plaintiff's suit because he concluded that the plaintiff had not established either that its name had acquired a secondary meaning in the area indicating the business operated by the plaintiff or that at the time that the defendant opened its store the area was within the region into which the trade of the plaintiff might reasonably be expected to extend in the natural expansion of its business. With respect to the first proposition the court relied upon the decisions of the Supreme Court of Virginia which are binding upon us since the case involves the common law rule of unfair competition, and our jurisdiction is based on diversity of citizenship. Pecheur Lozenge Co. v. National Candy Co., 315 U.S. 666, 62 S.Ct. 853, 86 L.Ed. 1103. The Supreme Court of Virginia applied the usual rule in Rosso & Mastracco, Inc. v. Giant Food Shopping Center, 200 Va. 159, 104 S.E.2d 776, holding that in determining the existence of unfair competition in the use of similar trade names by competitors in the same area the test is whether the resemblance is so close that it is likely to confuse a prospective customer. With regard to secondary meaning the court stated, page 780:

"The definition and elements of secondary meaning may be briefly stated as follows:

" 'Words and symbols used in connection with one's goods, services, or business, or physical attributes of goods, not capable of being appropriated as a technical trade mark, are deemed to have acquired a secondary meaning when they have become associated in the minds of purchasers

or customers with the source or origin of goods or services rather than with the goods or services themselves.' Annotation, 150 A.L.R. at page 1079."

In reliance upon the Rosso case, the District Judge pointed out that while there was abundant evidence that the plaintiff was well known as FOOD FAIR in the area to persons in the grocery trade, and to investors on the stock market and to certain persons such as wholesalers who had special connections with the plaintiff's activities, there was a lack of evidence that the name identified the plaintiff to members of the general public who purchased groceries, meats, etc. He, therefore, held that the plaintiff had not established a secondary meaning for its name in the area.

■ We are in accord with this finding insofar as it sets out the testimony in the case but we do not agree with the ultimate conclusion that the plaintiff had failed to establish the existence of a secondary meaning of its name in the competitive area. The rule, not departed from in the Rosso case, is that such a secondary meaning exists if in fact a substantial number of present or prospective customers understand the designation when used in connection with a business to refer to a particular person or business enterprise. See Restatement of Torts, Section 716, Comment b; Nims, Unfair Competition and Trade-marks (4th Ed.), Section 38b, pages 160, 161.

■ Bearing this rule in mind, we are of the opinion that the plaintiff's name had actually acquired a secondary meaning in the Norfolk-Portsmouth area. It is true that the plaintiff had no retail store and hence no retail customers in the area; but this is not to say that it had no prospective customers, or was not known to the purchasing public. The business was well known to a substantial number of persons in active business in divers fields in the locality, anyone of whom was a potential customer of the plaintiff who might well be deceived by the name and style of the defendant's enterprise into believing that it was the business of the plaintiff. The absence of any witness testifying that he had actually been deceived as a consumer does not refute the deceptive character of the plaintiff's business. On the contrary, the opening of the defendant's store under a much advertised name would doubtless stimulate interest and inquiry and widen the plaintiff's reputation in the metropolitan area, in view of the easy means of communication and transportation available in the area and the movement of travelers from outside territory where plaintiff's business was in actual operation. Considerations of this kind doubtless led the defendant to adopt the plaintiff's name.

■■ We think also that the court was wrong in concluding from the evidence that the Norfolk-Portsmouth area was beyond the reach of the probable expansion of the plaintiff's business. It has been generally recognized since the decisions of the Supreme Court in Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713, and United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141, that an established trade name is entitled to protection not only in the area in which it already renders service or sells goods but also in areas to which its trade may reasonably be expected to expand. In the cited cases the issues were confined to the priority of use of a trademark in a given area and the question of expansion did not arise; but the court was careful to reserve it, saying in the Hanover case, 240 U.S. at 420, 36 S.Ct. at 363:

"We are not dealing with a case where the junior appropriator of a trade-mark is occupying territory that would probably be reached by the prior user in the natural expansion of his trade, and we need pass no judgment upon such a case. * * *"

Moreover, the court noted at page 415, 36 S.Ct. at page 361:

" * * * But where two parties independently are employing the same mark upon goods of the same

class, but in separate markets wholly remote the one from the other, the question of prior appropriation is legally insignificant, unless at least it appear that the second adopter has selected the mark with some design inimical to the interests of the first user, such as to take the benefit of the reputation of his goods, to forestall the extension of his trade, or the like."

It is, therefore, necessary to determine whether at the time the defendant opened its store in Norfolk there was a reasonable prospect of the expansion of the plaintiff's business into that area. The Judge said that on May 14, 1953 the plaintiff had a mere " 'hope of expansion' * * * and that plaintiff's possibility of expansion into the Norfolk area as of that date is too remote to sustain plaintiff's burden of establishing by substantial evidence that the name FOOD FAIR had then acquired a secondary meaning in this locality." This conclusion appears to us to be erroneous. The size and rate of expansion of the plaintiff's business at the time, the proximity and location of its existing stores including the Alexandria store operated under another name, the negotiation for a chain of stores in Newport News in 1955, the effort to buy out the defendant in 1956, and the actual opening of the plaintiff's store in 1958 give strong support to the testimony of the plaintiff that as early as 1949 when the Baltimore warehouse was opened surveys of the area were made and expansion of the business into the area was not merely possible but probable.

The Virginia decisions are not at variance with these conclusions. In Rosso & Mastracco, Inc. v. Giant Food Shopping Center, supra, the court was called upon to decide whether the use of somewhat similar trade names by two competitors in the same line of business in the same area was likely to confuse possible customers. The court had no occasion to decide to what extent a trade name owner is entitled to protection in territory in which the owner does no business under the name but may reasonably expect to occupy in the future. That question, however, has been extensively litigated in subsequent cases in various jurisdictions and to decisions in this line we look for guidance.

■■ Following the intimation in the opinion of the Supreme Court in the Hanover case quoted above that a competitor may not deliberately appropriate the trademark of another with a design to forestall the expansion of the latter's trade, it has been generally held that the owner of a trade name may enjoin infringement in territory to which his business has not yet extended. In the great majority of these cases it was shown that the name had become known in greater or less degree as that of the owner to a substantial number of persons in the area through various forms of advertisement or information obtained by visits to regions in which the business was being carried on. Obviously, the extent to which a trade name becomes known to the public in the present day has been greatly increased by the development of modern sales methods and modern advertisement and by the increase of travel throughout the country. In any event, protection of a trade name may be given if persons residing in the area with knowledge of the trade name are likely to be confused by an infringement. See White Tower System v. White Castle System, 6 Cir., 90 F.2d 67; Stork Restaurant, Inc. v. Sahati, 9 Cir., 166 F.2d 348; Lincoln Restaurant Corp. v. Wolfies Restaurant, Inc., 2 Cir., 291 F.2d 302; Hanson v. Triangle Publications, 8 Cir., 163 F.2d 74; Western Oil Refining Co. v. Jones, 6 Cir., 27 F.2d 205; Sweet Sixteen Co. v. Sweet "16" Shop, 8 Cir., 15 F.2d 920; Buckspan v. Hudson's Bay Co., 5 Cir., 22 F.2d 721; Terminal Barber Shops v. Zoberg, 2 Cir., 28 F.2d 807; Nims, Unfair Competition and Trademarks, (4th Ed.), Section 218b.

■ The existence or non-existence of good faith on the part of the second

user of the trade name is a powerful factor in determining whether the name is entitled to protection in an area to which the business it identifies has not actually extended. Indeed, it is pointed out in Nims on Unfair Competition and Trade-marks, Section 218b, page 649, that to some extent the emphasis of the inquiry has been shifted in determining whether a trademark or trade name is entitled to extra-territorial protection, so that in some cases much more stress is placed upon the question of good faith and much less on the extent to which the name is known in a given area. See Pike v. Ruby Foo's Den, 98 U.S.App.D.C. 126, 232 F.2d 683; Lincoln Restaurant Corp. v. Wolfies Restaurant, Inc., supra; Safeway Stores, Inc. v. Sklar, E.D.Pa., 75 F. Supp. 98; Adam Hat Stores v. Scherper, E.D.Wis., 45 F.Supp. 804; Ammon & Person v. Narragansett Dairy Co., 1 Cir., 262 F. 880; Maison Prunier v. Prunier's Restaurant & Cafe, Inc., 159 Misc. 551, 288 N.Y.S. 529.

In the instant case we do not have to pass on the relevant weight of the testimony as to the elements which enter into the problem. The existence of all the necessary elements at the time of the infringement were proved by substantial evidence. It was shown that the plaintiff's business and trade name were known to a substantial number of persons in the Norfolk-Portsmouth area and that the probability of an expansion of the plaintiff's business into the area existed and that the defendant deliberately and knowingly appropriated the plaintiff's name for its own business and actually imitated the character and style of the signs by which the plaintiff's business was made known to the public. Under this combination of circumstances we reach the conclusion that the plaintiff's name was entitled to protection and that the defendant should be enjoined from the use of it in the future. We do not think, however, that the plaintiff is entitled to an accounting for profits during the period prior to the institution of suit in which the defendant carried on its business under the name in the area. The defendant was notified in advance of the plaintiff's claim to the exclusive use of the name and thereafter made use of it at its own risk. But on the other hand the plaintiff on its part made no attempt to enjoin the use of its name prior to the institution of the present suit and thereby disentitled itself to an accounting for profits.

Reversed and remanded.