The ELIZABETH TAYLOR COSMETICS
COMPANY, INC., and Chesebrough–
Pond's, Inc., Plaintiffs,

v.

ANNICK GOUTAL, S.A.R.L. and
Annick Goutal, Inc.,
Defendants.

No. 87 Civ. 4978 (RWS).

United States District Court,
S.D. New York.

Nov. 18, 1987.

Pennie & Edmonds, New York City (Berj A. Terzian and William G. Pecau, of counsel), for plaintiffs.

Stecher Jaglom & Prutzman, New York City (Paul F. Kilmer and Lisa Mariorenzi-Musco, Mason, Fenwick & Lawrence, Washington, D.C., of counsel), for defendants.

## OPINION

SWEET, District Judge.

### Introduction

Plaintiffs, The Elizabeth Taylor Cosmetics Company and Chesebrough–Ponds, Inc. (collectively "Taylor") commenced this action against defendants Annick Goutal S.A. R.L. and Annick Goutal, Inc. (collectively "Goutal") seeking a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that the use by Taylor of the mark "Elizabeth Taylor's Passion" does not constitute unfair competition or infringe any mark claimed by Goutal including the Annick Goutal product line "Passion." Goutal has counterclaimed for a preliminary injunction pursuant to Rule 65 Fed.R.Civ.P. Upon the facts and conclusions set forth below, judgment granting Goutal an injunction will be entered.

### Prior Proceedings

The complaint was filed on July 13, 1987 and the answer and counterclaim on August 6, 1987. Expedited discovery was had, and Goutal moved for a preliminary injunction. Pursuant to Rule 65, Fed.R. Civ.P., the hearing on the motion was converted to a final trial on the merits. The trial was commenced on October 2, 1987 and continued on October 5 and 6, 1987, during which the involved principals of both parties testified as did an expert witness for Taylor and fact witnesses for Goutal.

### The Issues

This action presents a challenging interplay between differing merchandising techniques and the law of infringement and unfair competition. The customary context for these issues is the challenge offered to an established mark by the mark of a newcomer who frequently seeks to come as close to the earlier mark as possible without infringing.

Here the reverse is presented—a mark is adopted and becomes successful as a result of the quality of the product and its acceptance by the sophisticated purchasers at the exclusive stores where it is sold. The later comer, Taylor, enters the market already equipped by unusually strong name recognition and an advertising budget in the millions. It consciously adopts the same designation for its product, "Passion," as the earlier product.

While consideration of the *Polaroid* factors has become obligatory in this context, the controlling element must be the concept of fairness in competition. To determine whether Goutal is entitled to the relief sought, the court must conduct two independent yet overlapping factual inquiries. First, it must determine whether Annick Goutal's "Passion" is a protectible trademark. If it is, the court must then determine whether consumers are likely to be confused as to the source of the products. *Lois Sportswear, U.S.A., Inc., v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir.1986); *Thompson Medical Co. v. Pfizer*, 753 F.2d 208 (2d Cir.1985); *Eli Lilly & Co. v. Revlon, Inc.*, 577 F.Supp. 477, 482–83 (S.D.N.Y.1983). The latter of these inquiries is conducted by examining the factors set forth in *Polaroid Corp. v. Polarad Electronic Corp.*, 287 F.2d 492 (2d Cir.1961), cert. denied, 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961).

## Findings of Fact

### The Parties

Elizabeth Taylor Co. is a corporation organized under the laws of California with its principal place of business in Bel Air, California and is the owner of the trademark Elizabeth Taylor's Passion for fragrance products. Chesebrough is a corporation organized under the laws of New York with its principal place of business in Westport, Connecticut. Chesebrough is the exclusive licensee of the mark Elizabeth Taylor's Passion owned by the Elizabeth Taylor Co., and is distributing Elizabeth Taylor's Passion fragrance products through its Parfums International Ltd. division ("Parfums") which sells products to department and specialty stores.

Annick Goutal, S.A.R.L. is a French limited liability company, with its principal place of business in Paris, France. Annick Goutal, Inc. is a New York corporation with its principal place of business in New York, New York and is the American distributor of the products of Annick Goutal, S.A.R.L. Both Annick Goutal, Inc. and Annick Goutal, S.A.R.L. are affiliated companies and subsidiaries of the Societe du Louvre which is in turn owned by the Tattinger Group. The Societe du Louvre owns hotels and restaurants and businesses in industry, champagne, fragrances, finance, printing and public relations.

### Entry into the Market

The market for fragrances in the United States is highly competitive, and competing brands are listed in an International Fragrance Foundation publication.

Annick Goutal, after years of apprenticing in perfumery, began creating fragrances on her own in 1978. She had previous careers as a concert pianist and a model. One of her first scents was "Passion," a combination of jasmine, vanilla and tubereuse. "Passion" was initially sold privately through friends. Annick Goutal S.A.R.L., was not organized until 1980, when a small store was established in Paris as the success of her products developed through word of mouth. Then in 1985, a larger, more impressive shop near the Place Vendome was established when Annick Goutal joined the Tattinger Group of companies as a subsidiary of the Societe de Louvre, a Tattinger company. She thus acquired the resources to package and market her goods in the United States, and Annick Goutal, Inc., the United States sales representative, was then formed.

Prior to 1985, Goutal's United States sales were negligible and had been to exclusive shops featuring Parisian imports. In the fall of 1985, however, Goutal entered into a distributorship contract with Bergdorf–Goodman, an exclusive New York department store, and obtained valuable shelf space in this prestige outlet. Since then contracts with other so-called "first-tier" stores have been concluded, and Goutal's sales have increased.

In October, 1986, as "Passion" was becoming popular, Goutal filed for trademark registration of the mark "Passion" for fragrance products. The Trademark Office has not yet rendered a decision as to whether to grant Goutal the trademark.[1]

---

1. A party is entitled to bring an action for trademark protection even if the mark is not registered. 15 U.S.C. § 1125(a).

Whereas before 1985, sales of all Goutal products in the United States totaled approximately $3,000, in 1985, the sales of "Passion" products alone totaled approximately $10,000. In 1986 sales of "Passion" products were up to $64,000. By the end of 1986, sales had expanded to 16 or 17 stores. At present, Annick Goutal's Passion fragrance products are sold at:

Bergdorf Goodman in New York;

Frost Bros. stores in San Antonio, Austin, Houston, Dallas, Fort Worth and Corpus Christi, Texas;

I. Magnin in Palm Springs and San Francisco, California;

Several Nordstroms stores in Los Angeles, Orange County and San Francisco, California;

Dolly K. Designs in Washington, D.C.;

Margie Roth in Sylvania, Ohio; and

Anastasia in Beverly Hills, California.

By August, 1987 sales of "Passion" for that year amounted to about $34,000, including products on order. This does not include Christmas sales, which amount to much of the year's profits. Goutal has projected that by June of 1988, its products will be offered in approximately 40 stores, and that its sales should increase accordingly. Based on the rate of growth of sales since 1985, the United States is "going to become a major market" for Annick Goutal Passion products.

Additionally, Goutal began to advertise its products in 1986 and 1987, spending $50,000 on promotional campaigns aimed mainly toward "first-tier" consumers.

Annick Goutal and her fragrance products have received a significant amount of publicity in the United States' press, including articles in Vogue, Harper's Bazaar, Town & Country, Women's Wear Daily, The New York Times' Notes on Fashion Column, and newspapers and magazines in California and Texas. Between September, 1985 and December, 1986, Annick Goutal made six trips to the United States in connection with the launch of her fragrance products here, and during three trips made personal appearances at Bergdorf Goodman and I. Magnin to promote her products. On January 28, 1986, in connection with the launch of Annick Goutal's products at Bergdorf Goodman, a large press cocktail party, which 80–100 press representatives attended, was held at the Bergdorf Goodman store.

In 1985 Chesebrough Ponds, Inc. determined that success in the highly competitive perfume and toiletry market could best be achieved by developing a brand with "borrowed interest and built-in awareness," which according to the general manager of Parfums would "allow us to get a lot more bang for the buck" through advertising and sales promotion of a famous name and personality. In the summer of 1985, Chesebrough–Ponds, Inc., through its Parfums division, began negotiations with Elizabeth Taylor regarding the marketing of a fragrance bearing her name. Such an agreement was subsequently concluded between Elizabeth Taylor Cosmetics Co. and Chesebrough–Ponds.

Throughout the remainder of 1985 and 1986, Parfums conducted marketing studies regarding consumer familiarity with Ms. Taylor and consumer preferences for fragrance names. Results first proved a 98% consumer awareness of Ms. Taylor, and second, narrowed down the choices of possible names for the product.

A preliminary search of the word "passion" conducted in the summer of 1985 revealed several applications or registrations for marks such as "Grain de Passion," "Winter Passions," "Passion Parfum," "Violet Passion" and "Bronze Passion" for fragrances and cosmetics. A subsequent search to determine the availability of the word "passion," to be used as part of a mark with the words "Elizabeth Taylor's," were reported on March 21, 1986. That search also revealed a number of marks containing the word "Passion," although it did not disclose any use of or claim to the word "passion" by defendants.

By April 3, 1986, the three primary names under consideration for the Elizabeth Taylor fragrance were "Elizabeth Taylor's Passion," "Elizabeth Taylor's Fascination," and "Elizabeth Taylor's Divine Extravagance."

Detailed plans for the introduction of the Elizabeth Taylor fragrance were being formed by July of 1986. It was decided that the product would be introduced by a national publicity campaign involving Elizabeth Taylor and linking her and her image and likeness closely to her fragrance. In October of 1986, Chesebrough conducted in-deputy research to measure consumer reactions to the bottle design, fragrance options and the name of the fragrance. Although Parfums' executives preferred the two non-"passion" named, Elizabeth Taylor expressed her preference for the mark "Elizabeth Taylor's Passion," and subsequent results of a test requiring a forced choice from hundreds of consumers among the three candidate marks showed that "Elizabeth Taylor's Passion" was the strongest choice.

By November, 1986, steps were underway to have labels and products prepared to establish a date of first use for the purpose of filing a trademark application to register the mark Elizabeth Taylor's Passion in the United States Patent and Trademark Office. Thus, the name was settled upon, and by the end of 1986, product and packaging production was well under way.

On January 14, 1987, Elizabeth Taylor held a "secret" press conference in which she announced her "Elizabeth Taylor's Passion" fragrance. There was coverage on all major television stations, on CNN, in newspapers and in magazines. Between January 14 and May 3, 1987, over 500 articles in newspapers and magazines were written concerning the "Elizabeth Taylor's Passion" products and as of today there have been approximately 700 such reports. Additionally, the "Elizabeth Taylor's Passion" products have been widely reported in the electronic media including programs such as *A Current Affair, Good Morning America, Lifestyles of the Rich and Famous* and *Hour Magazine.*

Chesebrough has expended to date in excess of $6,000,000 dollars on advertising and promoting the "Elizabeth Taylor's Passion" products. In addition, retail stores have expended $3,000,000 dollars advertising and promoting the "Elizabeth Taylor's Passion."

The formal presentations and solicitations of orders from the trade began on January 21, 1987 and have been conducted continuously thereafter. By the early part of August four to five hundred stores had the product and sales of the product to the public began. Presently, approximately 1100 stores carry the "Elizabeth Taylor's Passion" fragrances. Over 14 million dollars in sales have been recorded for just mid-July to the end of September.

**Trademark Searches and Competitors**

Chesebrough claims first to have been alerted of the use of the word "passion" in connection with Annick Goutal products when Goutal's attorney called Chesebrough in January, 1987, after the first public announcement of Elizabeth Taylor's Passion fragrance product. Chesebrough then obtained the file relating to Annick Goutal's Passion mark from the Patent and Trademark Office. On February 18, 1987, Chesebrough arranged for its trademark search firm to monitor Annick Goutal's application for registration of Passion.

In March, 1987, the Patent and Trademark Office examiner reviewing Taylor's application for registration of their mark informed plaintiffs of his determination that Taylor's mark "so resemble[s]," *inter alia,* Annick Goutal's mark "as to be likely, as used in connection with the goods and/or services, to cause confusion, or to cause mistake, or to deceive. Nevertheless, Taylor's plans to begin mass marketing in the summer of 1987 went ahead as scheduled. It later filed this action for a declaratory judgment in apparent response to later warnings by Goutal's counsel.

However, since 1985, both Chesebrough executives responsible for the Elizabeth Taylor line of products had visited the area at Bergdorf Goodman where the Annick Goutal counter is located. Responsible officers of Chesebrough received copies of the 1986 Fragrance Foundation Reference Guide, published by the Fragrance Foundation, an industry trade association, which listed Passion as a fragrance product of Annick Goutal.

A number of fragrance products bearing the word "passion" were introduced into evidence; the "Aromance Passion Aroma Disc"; "Grain de Passion" eau de toilette; "My Passion" cologne "Desert Passion" parfum body lotion; "Passion de Paris" eau de toilette; "Tender Passion" perfume spray "Scorpio's Passion" fragrance and Julio Davi's "Passion." Only "Grain de Passion" appears to compete with Goutal's "Passion," having been purchased at Henri Bendel in New York, and Goutal presented testimony indicating that the manufacture of that product has been discontinued.

The price levels of the products are comparable throughout the product lines. At the low end, Taylor's $25 eau de toilette is comparable to price to Annick Goutal's soon to be available Passion eau de toilette at $30. At the high end, perfume, plaintiff's product costs $165 with a special edition bottle priced at $200, and Annick Goutal's product costs $270. Perfume represents a very small percentage of the sales of both parties' products. The most significant part of the sales come at the lower price levels.

**Protectability of the Mark**

A mark which is "merely descriptive" of goods is not entitled to trademark registration, and thus trademark protection, unless the mark has "become distinctive of the applicant's goods in commerce." 15 U.S.C. § 1052(e), (f). Pursuant to this statutory mandate, caselaw has set out four catagories of marks, which connote varying degrees of protectibility: generic, descriptive, suggestive, and arbitrary or fanciful. *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976); *see Thompson Medical Co., supra*, 753 F.2d at 215; *McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979); *Eli Lilly & Co., supra*, 577 F.Supp. at 483.

At one end of the spectrum are generic marks, "the genus of which the particular product is a species" which are entitled to no protection. *Abercrombie & Fitch Co., supra*, 537 F.2d at 9. At the other end of the spectrum are arbitrary or fanciful marks. "An arbitrary mark is one in which an otherwise common word is used in an unfamiliar way." *Lever Brothers Co. v. American Bakeries, Co., supra*, 693 F.2d 251, 253 (2d Cir.1982). These marks are clearly protected.

In the mid-range, however, are the descriptive and suggestive categories—the latter receiving full protection while the former is protectible only upon proof of secondary meaning. These categories are often difficult to distinguish. However, this Circuit has determined that:

A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods.

*Abercrombie & Fitch Co., supra*, 537 F.2d at 11 (quoting *Stix Products, Inc. v. United Merchants & Manufacturers Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)).

Taylor contends that "Passion" is a descriptive mark and that Goutal uses it to describe a "sensual and heady" fragrance. It relies, in large part, on *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861 (S.D.N.Y.1962), aff'd, 312 F.2d 125 (2d Cir.1963), in which the court stated that the term "Joy" for perfume "is not one which is fanciful or arbitrary in relation to the type of product on which it is used," but instead "could be said to be descriptive of the product's end effect upon the user." *Id.* 201 F.Supp. at 864. Taylor fails to note, however, that the court went on to describe "Joy" as falling somewhere in between the descriptive and the arbitrary—as demanding "an effort of the imagination to be understood as descriptive." It thus held that "Joy" was suggestive, and although the court still required proof of secondary meaning, it is doubtful that such proof would, in light of the later cases, be required today. *See, e.g., Abercrombie & Fitch Co., supra; see also* 3 R. Callmann, The Law of Unfair Competition Trademarks and Monopolies § 18.09, at 85, 88 & n. 111 (4th ed. 1983).

Although the word "passion" may be used frequently in fragrance advertising copy, it is not a descriptive term. Instead

of describing the product, it describes an emotion the fragrance seeks to induce. Connecting the emotion to the fragrance requires "an effort of the imagination," and thus Goutal's "Passion" mark is most aptly described as suggestive and deserving of protection in the absence of secondary meaning.

### The Polaroid Factors

The next step in deciding whether Goutal is entitled to injunctive relief is determining whether consumers are likely to be confused as to the origin of the products. This analysis must be conducted by examining the *Polaroid* factors, a test once thought applicable only to cases where the goods in question are non-competitive but since extended to cases involving competing products. *See, e.g., Vitarroz Corp. v. Borden, Inc.*, 644 F.2d 960, 965 (2d Cir. 1981). The factors, as set out by the *Polaroid* court are:

> the strength of the mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith in adopting its own mark, the quality of defendant's product, and the sophistication of the buyers.

*Polaroid Corp., supra*, 287 F.2d at 495. Each will be examined in turn.

### a. The Strength of the Mark

The "strength" of a mark has been defined as "the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous, source." *McGregor–Doniger Inc., supra*, 599 F.2d at 1131. The test for determining the strength of a mark overlaps with the test for protectibility of a mark, for example, suggestive marks are stronger than descriptive marks. *See, e.g., Id.; Eli Lilly & Co.*, 577 F.Supp. at 483–84. However, other factors, too, are relevant to strength, such as secondary meaning and third party usage.

Proof of secondary meaning, although not mandatory for establishing protectibility of a suggestive mark, may indicate the strength of a mark by showing consumer recognition. *See Vitarroz, supra*, 644 F.2d at 968; *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 486 F.Supp. 414, 420 (S.D.N.Y.1980). In this case, secondary meaning for the Goutal "Passion" mark is limited. Prior to 1985, American sales of Annick Goutal products were minimal. In fall of that year, sales began at what are known as "first-tier" stores, such as Bergdorf–Goodman in New York, and I. Magnin in San Francisco. Since then, sales have steadily increased, as have sales outlets. However, all this has taken place in the realm of the "first-tier." Additionally, any advertising of Goutal's "Passion," has been directed at customers of these first-tier stores. Thus, if Annick Goutal's "Passion" has obtained any secondary meaning up until now, it has done so only amongst the most exclusive of consumers.

Nevertheless, absence of mass-market secondary meaning in this case is not an insurmountable obstacle for Goutal, as they have introduced evidence showing the expansion of their American market. "Secondary meaning in the making" is also entitled to protection, *National Lampoon, Inc. v. American Broadcasting Cos.*, 376 F.Supp. 733, 747 (S.D.N.Y.), aff'd, 497 F.2d 1343 (2d Cir.1974), and this court will take such potential into consideration when balancing the "strength of the mark" against other factors.

However, a mark can be weakened by extensive third-party use. *See Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 1005 (2d Cir.1983). The Second Circuit has noted that "the significance of third-party trademarks depends wholly upon their usage" such that the alleged infringer must present "evidence that these trademarks were actually used by third parties, that they were well promoted or that they were recognized by consumers." *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir.1976). Taylor's evidence of the use of "Passion"

in fragrance products has not weakened Goutal's mark. None of these low cost items compete either in quality, price, or location with Goutal.

Moreover, as this Circuit noted in *Scarves by Vera*, third-party usage is less troublesome when the mark contains combinations of words that include the mark in question, and when the other marks stand for unrelated products—such as lipstick and room fresheners. *Id.* That the Taylor mark itself may be a combination of words is, to the untrained eye, debatable. The typeface differences between "Elizabeth Taylor's" and "Passion" on the package are dissimilar enough to lead at least some consumers to believe the former part of the logo denotes origin rather than product name.

In sum, based on the suggestive nature of the mark, the mark's secondary meaning, and third-party usage, "Passion" can best be described as a mark falling in the middle ground between strong and weak; it is not undeserving of protection, but its strength is limited by its restricted market.

**b. Similarity of the Marks**

The "Elizabeth Taylor's Passion" products were designed to convey the image of Elizabeth Taylor as a celebrity, and to be very "Hollywood," dramatic, glamorous and rich, yet upscale, elegant and unique. The bottle design was finalized in the summer of 1986 as part of a desired appearance that an expert in marketing described as bold, aggressive and flamboyant, employing a purple and gold fluted, diamond shape. The Taylor carton is purple and lavender, with the words "Elizabeth Taylor's Passion" printed in gold. "Elizabeth Taylor's" appears above the word "Passion," is slightly less than half the size of the latter word, and is under- and overlined with thin gold lines. The words "Elizabeth Taylor's" and the word "Passion" were paced on two lines because of space limitations. To balance the longer words, "Elizabeth Taylor's" were made shorter in height than the word "Passion," but the words were further emphasized by the use of gold bars.

The mark "Annick Goutal" appears on all packages for all of the Goutal products. Moreover, all of the bottles and packages for all the various kinds of Goutal products are exactly the same except for the description of the scent. The colors gold and ivory appear on all the packaging and labeling of Goutal products (except for one white package), and are the background colors of her Paris store and her in-store displays in the United States. On the "Passion" carton, the word "Passion" is written in gold and isolated from the manufacturer's name because it is surrounded by a gold wreath. "Annick Goutal" also appears on the box toward the bottom. It appears in slightly larger yet slightly thinner gold writing. Annick Goutal described the significance of these colors: "Perhaps this harks back to my cultural background. That represents harmony; it's tender, elegant very French. It reminds me of Versailles." The bottle appears antique, sophisticated and costly.

A side-by-side comparison of the Taylor and Goutal products reveals little or no similarity in packaging—short of the fact that both packages have the word "passion" written on them. Thus the "especially important" context of the "overall packaging" is quite dissimilar. *Lever Brothers Co., supra,* 693 F.2d at 257.

There is little similarity in the physical packaging of the products weighing against Goutal. Packaging, however, is only one consideration. The court must consider not only "whether the consumer will know the difference if he sees the competing products on the same shelf," but also "whether he will know the difference if [the product] is *singly* presented and he has heard of [the senior mark]." *American Home Products v. Johnson Chemical Co.,* 589 F.2d 103, 107 (2d Cir.1978). Although in this case, consumers are more likely to have heard of "Elizabeth Taylor's Passion" than they are to have heard of Goutal's "Passion," because of the extensive publicity attending Elizabeth Taylor, protection can be afforded in cases of reverse confusion. *See, e.g., W.E. Bassett Co. v. Revlon, Inc.,* 305 F.Supp. 581, 587 (S.D.N.Y.1969), aff'd in relevant part, 435

F.2d 656 (2d Cir.1970); *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219 (D.Colo.1976), mod., 561 F.2d 1365 (10th Cir.1977).

**c. Proximity of the Products**

Taylor contends that the products do not compete because they are sold through different channels of trade to different kinds of purchasers. It claims that Goutal products are sold only in exclusive stores and are expensive, while its products are mass marketed and more moderately priced.

Inasmuch as Goutal has not, as of yet, entered the mass department store market —for example, such stores as Macy's, Bloomingdales, Jorden Marsh—the products are not in close proximity. However, inasmuch as Taylor has begun to market its products in such stores as Neiman–Marcus, the products do directly compete. The price differential that Taylor claims separates the products, moreover, is inconsequential. While the companies' top of the line products do differ rather widely in price—the Taylor perfume selling for $165 an ounce while the Goutal perfume sells for $270 an ounce, these products make up a small fraction of the companies' overall sales. The parties introduced evidence showing that most of their marketing volume is made up of sales of less expensive items. Currently, Taylor sells a one-and-one-half ounce bottle of eau to toilette for $25, while Goutal sells a one ounce bottle of eau de parfum for $45 per ounce—the latter a more concentrated product. Notably Goutal is introducing an eau de toilette which will sell for $30 per ounce. Thus the price differential is less significant at the lower end of the product scale.

**d. Bridging the Gap**

The question of whether Goutal "might one day expand into the market [Taylor] now occupies, using the ["Passion"] mark." *Lever Brothers Co.*, 693 F.2d at 258, is answered that to some extent, it already has.

With respect to the products themselves, there is no gap to bridge; the companies manufacture comparable products, and whatever price differential exists is, as discussed above, minimal as it pertains to each firms' best selling items. There is a gap, albeit a marginal one, between the types of outlets carrying Taylor products and those carrying Goutal products. The gap is only marginal in that Taylor has expanded into such "first-tier" stores as Neiman–Marcus, the class of store in which Goutal products are generally sold, yet existent in that Goutal has shown no signs of expanding its market to include such mainstream stores as Macy's.

**e. Actual Confusion**

Goutal's competitors in the fragrance business are Chanel, Christian Dior, Guerlain and Yves Saint Laurent and no evidence of lost sales due to the advertising of Elizabeth Taylor's Passion was introduced. No direct evidence of confusion of consumers was presented other than inquiries from consumers seeking to determine whether the Goutal product is related to Elizabeth Taylor's Passion.

Although it is not absolutely necessary that a party present proof of actual confusion in order to prevail, such evidence can be a "strong indicator" of likelihood of confusion. *Plus Products, supra*, 722 F.2d at 1006; *McGregor–Doniger Inc.*, 599 F.2d at 1136. The evidence of actual confusion presented by Goutal is scant. It consists mostly of anecdotal testimony of Goutal saleswomen who are employed at Bergdorf–Goodman and of Annick Goutal herself. However, the court recognizes that it is "difficult to establish actual confusion on the part of retail customers." *Id.* (citing *W.E. Bassett Co. v. Revlon Inc.*, 435 F.2d 656, 662 (2d Cir.1970)). This is especially true in a case such as this where one party has "been in the market only a short time." *Nina Ricci, S.A.R.L. v. Gemcraft Ltd.*, 612 F.Supp. 1520, 1529 (S.D.N.Y.1985). Thus, this factor only slightly damages Goutal's position.

**f. Taylor's Good Faith**

The evidence of knowledge weighs in Goutal's favor. Taylor knew of Goutal's mark in 1986 after the expenditure of substantial funds, but before going public and before the mass marketing began. Two

other names for the Taylor fragrance were preferred by officers of Parfums International: "Elizabeth Taylor's Divine Extravagance" and "Elizabeth Taylor's Fascination," which were discarded only because Ms. Taylor insisted on the "Passion" name. At the same time, however, knowledge of any specific trademark registration by Goutal in January, 1987 when the first Taylor announcements were leaked is doubtful.

This Circuit has held that awareness on the part of the junior user does not necessarily constitute bad faith. *McGregor–Doniger Inc., supra,* 599 F.2d at 1137; *Mushroom Makers Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 48 (2d Cir.1978), cert. denied, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). However, in those cases, the senior user's mark was registered as covering specific products that were different in kind from those bearing the junior user's mark. That allowance is inapplicable here.

It is obvious from its reliance on "borrowed interest" that Taylor did not adopt the "Passion" name in an attempt to bootstrap sales of its products onto sales of Goutal's products and presently holds an honest belief in the strength of its position. Faced with choosing between the preference of the person whose interest was being borrowed and whatever rights had been acquired by Goutal, Chesebrough opted for Elizabeth Taylor's Passion and placed considerable money on its choice. While perhaps not bad faith, Taylor has not demonstrated the utmost good faith.

**g. Quality of the Taylor Product**

Goutal has presented anecdotal accounts tending to prove the inferiority of Taylor's product. These were accounts of shoppers who apparently said that they found the scent unpleasing. Additionally, there was one press story about shoppers who tried to wash off the Taylor fragrance after having been sprayed in Bloomingdale's.

While Goutal concedes that there is nothing chemically inferior about "Elizabeth Taylor's Passion," the nose of the factfinder establishes that the Goutal "Passion" fragrance is lighter, more evocative, and more sophisticated than "Elizabeth Taylor's Passion." However, this Circuit has held that "[b]ecause the purpose of protecting a user's mark on noncompeting goods is, in part, to guard against tarnishing the reputation of the mark, ... proof that [Taylor's fragrance] has proved highly successful with consumers weighs heavily against [Goutal]." *Lever Brothers Co., supra,* 693 F.2d at 258. Taylor has offered a sufficient quantum of evidence to prove its success with consumers. This is so even in the "first-tier," as Taylor has shown that its response from a mailing to Neiman–Marcus customers was substantial. Thus, this factor weighs in Taylor's favor.

**h. Sophistication of the Buyers**

As the court in *Nina Ricci S.A.R.L.,* noted, as witnesses testified and as common experience dictates, there are really two groups of perfume consumers: women who buy the products for themselves and men who buy it as gifts for women. *Nina Ricci S.A.R.L., supra,* 612 F.Supp. at 1529–30. In general, women are sophisticated fragrance consumers: "They know their perfume." *Id.* at 1529. Men, however, tend to be less sophisticated. *Id.* at 1530. All buyers may be slightly less sophisticated in this case, because Taylor's product is relatively new and Goutal's sales have only recently become at all substantial. Nevertheless, assuming more women buy perfume than men, this factor weighs slightly in Taylor's favor.

**The Balance of Factors**

An analysis of the *Polaroid* factors, on balance, yields results favoring Goutal. As the owner of a protectible mark, Goutal has shown that there is some likelihood of confusion—that likelihood increased in the "first-tier" marketplace. This is especially so in light of the fact that the products are direct competitors.

The weighing of these *Polaroid* factors requires a factual determination of their relative strengths as far as this court is concerned. It is, of course, recognized that a contrary view is held by the reviewing court which has treated the weighing process as a conclusion of law, vitiating the factfinding process of the trial court. *Plus Products, supra,* 722 F.2d at 1004–05. Such a conclusion frees the reviewing court

from being bound by what is by logic and common sense is a factual determination. By such a classification, the reviewing court virtually mandates an appeal from every trial court determination based on a *Polaroid* analysis resulting in increased uncertainty and confusion in an area which is difficult at best. *LeSportsac Inc. v. K Mart Corp.*, 754 F.2d 71 (2d Cir.1985); *see Stormy Clime Ltd. v. ProGroup, Inc.* 809 F.2d 971, 974 (2d Cir.1987).

### Conclusions of Law

■ This court has jurisdiction of the parties hereto and the subject matter of plaintiffs' claims and defendants' counterclaims. The pivotal issue is whether there exists a likelihood of confusion concerning the source of the parties' Passion fragrance products. *Lever Bros. Co., supra,* 693 F.2d 251; *Aris–Isotoner Gloves, Inc. v. Fownes Bros. & Co.,* 594 F.Supp. 15, 19 (S.D.N.Y.1983), and doubts about likelihood of confusion in favor of the senior user. *American Home Prods. Corp., supra,* 589 F.2d at 107. The second comer has a duty to so name and dress his product as to avoid all likelihood of consumers' confusing it with the product of the first comer. *Perfect Fit Industries, Inc. v. ACME Quilting Co.,* 618 F.2d 950, 953 (2d Cir.1980), *cert. denied,* 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed. 2d 71 (1982); *Aris–Isotoner Gloves, Inc., supra,* 594 F.Supp. at 19.

Both parties use their Passion marks on their goods as trademarks, *i.e.,* "a word, name symbol, device or combination thereof adopted and used by a manufacturer or merchant to identify and distinguish his goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. This is so even though Goutal uses Passion in conjunction with the house mark, Annick Goutal, to designate a particular line of fragrance products with a scent composed of tubereuse, jasmine and vanilla.

Annick Goutal's Passion mark has attained some secondary meaning in the relevant markets where it is used and it is entitled to protection in those markets, here in New York, Texas, California, Washington, D.C. and Northern Ohio, and also in the zone of natural expansion for the mark. *See Truck Equipment Service Co. v. Fruehauf Corp.,* 536 F.2d 1210, 1219 (8th Cir. 1976); *Food Fair Stores, Inc. v. Lakeland Grocery Corp.,* 301 F.2d 156, 161–62 (4th Cir.1962); *Dawn Donut Co. v. Hart's Food Stores,* 267 F.2d 358 (2d Cir.1959).

■ Where secondary meaning is in the making, others cannot interfere with its development by infringing the mark. *National Lampoon, Inc., supra,* 376 F.Supp. at 747; and a minimal showing of secondary meaning is required in a reverse confusion case. *See Ameritech, Inc. v. American Information Technologies Corp.,* 811 F.2d 960, 966 (6th Cir.1987); *Big O Tire Dealers, Inc.,* 408 F.Supp. 1219; *W.E. Bassett Co.,* 305 F.Supp. at 587 (S.D.N.Y.1969), *aff'd,* 435 F.2d 656 (2d Cir.1970);

■ Because a trademark owner is not required to act against every infringing use no matter how inconsequential at risk of losing his rights, *Playboy Enterprises, Inc., supra,* 486 F.Supp. at 422–23, the inconsequential infringement shown here does not strip Annick Goutal's Passion mark of its protectability.

■ The proper test for likelihood of confusion is not whether consumers would be confused in a side-by-side comparison of the products, but whether confusion is likely when a consumer, familiar to some extent with the one party's mark, is presented with the other party's goods alone. *Paco Rabanne Perfumes, S.A. v. Norco Ent., Inc.,* 680 F.2d 891, 893 (2d Cir.1982); *American Home Products Corp., supra,* 589 F.2d at 107. This single presentation test is particularly appropriate in a case such as this where the junior user extensively employs television and print advertising. *American Home Products Corp., supra,* 589 F.2d at 107. Because the survey performed by Chesebrough's expert was based on side-by-side comparison of the parties' products, it is immaterial and entitled to no weight.

■ The Lanham Act protects against confusion of any kind. *Lois Sportswear*

*U.S.A., Inc. v. Levi Strauss & Co.,* 631 F.Supp. 735, 745 (S.D.N.Y.1985), *aff'd,* 799 F.2d 867 (2d Cir.1986). Reverse confusion, in which the consumer who encounters the senior user's goods confuses them with the highly promoted goods of the junior user, is also encompassed. *Id.; Plus Products, supra,* 722 F.2d 999; *Big O Tire Dealers, supra,* 561 F.2d at 1371. Moreover, "[t]he public's belief that the mark's owner sponsored or otherwise approved of the use of the trademark satisfies the confusion requirement." *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.,* 604 F.2d 200, 205 (2d Cir.1979).

However, before granting injunctive relief, the court must balance the equities and determine whether the harm to the party seeking the injunction if it is not granted outweighs the harm to the party opposing the motion if it is granted.

The competition presented by the facts found above is between two fundamentally different merchandising approaches, one reliance upon the quality of the product and a growing acceptance by a sophisticated buyer through association and word of mouth, and the other, the employment of the good will attached to a media personality enhanced by extensive advertising. In such a context, it is necessary to go beyond the customary *Polaroid* factors which as found above favor Goutal but to repair to the underlying concepts of the Lanham Act in an effort to promote competition, the appropriate interests of sellers and most significantly the interests of the consumer. *See Vitarroz Corp., supra,* 644 F.2d at 966–67 (going beyond and citing cases going beyond the *Polaroid* factors in balancing relative interests). The Lanham Act was designed to protect *all* legitimate businesses from unfair competition. *See Thompson Medical Co., supra,* 753 F.2d at 212 n. 3. It was not merely intended to preserve the kind of good will that is purchased for millions of dollars.

To preclude Taylor from the use of "Passion" would create to Goutal a monopoly over the use of a suggestive unwarranted by the extent of the competition between the products and the degree of confusion present in the marketplace. Because Che-

sebrough has spent millions of dollars on promotions does not imply that millions can be required of it to adjust the existing competition in view of Goutal's failure to demonstrate a loss of sales to date.

On the other hand, Goutal is entitled to protect its mark, its good will resulting from its method of promoting its products, without acquiring a monopoly over the use of "Passion." Advertising budget and borrowed interest cannot be permitted to become the exclusive avenues of success in the marketplace to seek to achieve a balance between stark alternatives. Therefore, to prevent confusion in the area where it is most likely to occur, limited injunctive relief will be granted. *Spring Mills v. UltraCashmere House Ltd.,* 724 F.2d 352 (2d Cir.1983).

Taylor is enjoined from marketing "Elizabeth Taylor's Passion" in "first-tier" stores, for example, Bergdorf–Goodman, Nieman–Marcus, I. Magnum, Henri Bendel, and stores of comparable quality. It is hoped that the parties can agree upon the stores to be covered by this injunction to be set forth in the judgment to be entered upon notice. If further hearings are required, the parties should advise the court and a date for further proceedings will be set.

Settle judgment on notice.

IT IS SO ORDERED.