**Bruce E. KATZ and Bruce E. Katz, M.D., P.C., d/b/a Juva Skin & Laser Center/Medispa Plaintiffs,**

v.

**Michael MODIRI, Juvenex Manhattan, Inc., and Juvenex Ltd., Defendants.**

**No. 02 Civ. 7870(RLE).**

United States District Court, S.D. New York.

Sept. 8, 2003.

Ira G. Greenberg, Edwards & Angell, LLP, New York City, for Plaintiffs.

Albert Robin, Robin, Blecker & Daley, New York City, for Defendants.

## OPINION AND ORDER

ELLIS, United States Magistrate Judge.

## I. INTRODUCTION

On October 2, 2002, plaintiffs Bruce E. Katz ("Dr. Katz") and Bruce E. Katz, M.D., P.C., d/b/a Juva Skin & Laser Center/Medispa ("Juva MediSpa") (collectively, "Juva") filed a complaint against defendants Michael Modiri, Juvenex Manhattan, Inc., and Juvenex Ltd. (collectively, "Juvenex"), alleging federal trademark infringement, false designation of origin, and unfair competition; and state law claims of trademark infringement, unfair competition, and dilution. On October 28, 2002, Juva moved for an order granting a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. On November 14, 2002, Juvenex answered the complaint and filed its opposition to the motion. On February 19, 2003, the parties consented for the preliminary injunction motion to be decided by the undersigned, and on March 20, 2003, the Court heard oral argument on the motion.

Having considered the written and oral submissions of the parties, the Court hereby orders that the motion for a preliminary injunction be **DENIED.**

## II. BACKGROUND

### A. Juva MediSpa and Dr. Katz

In April 1999, Dr. Katz founded The Juva MediSpa, located at 60 East 56th Street in New York City. *See* Memorandum in Support of Plaintiffs' Motion for a Preliminary Injunction ("Pl.Mem.") at 3. The Juva mark identifies the name of plaintiffs' business, services and products, and is part of their Internet website address, *www.juvaskin.com. Id.* at 4–5. Between May 2000 and January 2001, Dr. Katz obtained three registrations for the Juva mark from the United States Patent and Trademark Office ("USPTO"). *See* Declaration of Dr. Katz ("Katz Decl.") at Exh. F.[1] He also federally registered the "MediSpa" service mark. *See* Defendants' Memorandum in Opposition to Plaintiffs' Motion for a Preliminary Injunction ("Def.Mem.") at Exh. 23, Reg. No. 2,443,-179, dated April 10, 2001.

Plaintiffs' business includes a "state-of-the-art medical facility," offering laser and cosmetic surgery, and skin care and general dermatology. Katz Decl. at ¶ 3. Customers can receive medical treatments for age spots, stretch marks, acne scars, and many other conditions, and may undergo treatments such as liposuction, hair transplantation, facelifts, and botox and collagen injections. *Id.* The business also includes a high-end health and beauty spa—the MediSpa—offering customized spa treatments formulated by Dr. Katz and other on-staff physicians. *Id.* at ¶¶ 3–4. Juva MediSpa's services range in price from $15 to $650 per treatment, and include massages, cellulite treatments, waxing, facials, including laser facials, specialized treatments such as medical-grade peels and laser hair removal, as well as body treatments such as scrubs and wraps.[2] *Id.* at ¶ 4. Among its most popular services are the "Anti–Aging" and "Beta–A–Complex" facials, developed and administered exclusively by Juva MediSpa. *Id.* at ¶ 7. In addition, Juva MediSpa sells hair care and skin products under the Juva name and mark, ranging in price from $10 to $95. *Id.* at ¶ 5. Juva MediSpa has advertised itself both locally and nationally since it opened. *Id.* at ¶ 8. Dr. Katz has appeared on various national and international news shows discussing the Juva MediSpa and its services and products, and he and the spa have been the subject of numerous newspaper and magazine articles. *Id.* at ¶ 9.

In late February or early March, 2002, Dr. Katz learned that a day spa named Juvenex would be opening at 24 West 32nd Street in New York City. *Id.* at ¶ 11. A press release published in April 2002 identified Michael Modiri ("Modiri") as its owner and/or operator. *Id.* During April 2002, Dr. Katz's attorney sent several demand letters to Juvenex's owners and to their public relations firm, advising them of the potential violation of Juva MediSpa's trademarks and service marks. *Id.* at ¶ 12. In August 2002, Dr. Katz received a phone call from Modiri, who stated that he

---

**1.** On May 23, 2000, Dr. Katz registered the Juva service mark with the USPTO for cosmetic and plastic surgery, medical services, skin care, health spa, and beauty salon services. Reg. No. 2,352,780. He obtained a second federal registration for the service mark on August 1, 2000. Reg. No. 2,373,961. On January 2, 2001, Dr. Katz acquired a trademark registration for Juva skin creams and lotions, and other hair, beauty, and medical products. Reg. No. 2,418,156.

**2.** *See* Juva MediSpa's menu of services, available at *www.juvaskin.com/medispa/medispa bodytxt.jsp.*

did not intend to cease using the Juvenex name and mark. *Id.* at ¶ 13. Modiri claims that he placed the call in late April 2002, and informed Dr. Katz that he believed their businesses were totally different and that he would proceed to open the spa. *See* Declaration of Modiri ("Modiri Decl.") at ¶¶ 20–23. In early September 2002, Dr. Katz learned that Juvenex had already opened its doors for business. Katz Decl. at ¶ 14.

### B. Juvenex

Business partners Modiri and Chong Yipak ("Yipak") designed and created the Juvenex Spa. *See* Def. Mem. at 4–5. Yipak has been involved in the spa business in the United States since she immigrated from Korea over fifteen years ago. *Id.* at 4; Declaration of Yipak ("Yipak Decl.") at ¶ 2. She previously owned and operated the Yipak Spa at 10 West 32nd Street in the Korea Town section of Manhattan, and during her years in New York City, had not heard of Dr. Katz or the Juva MediSpa. *Id.* at ¶¶ 2–4.

Sometime in 1997, Modiri, whose background is in computer science and data processing, began to consider a career in the spa business. Modiri Decl. at ¶ 3. He subsequently met Yipak at a spa convention in California. Def. Mem. at 4. The two agreed to become business partners and to build a luxury spa in New York City's Korea Town. *Id.* They researched spa facilities world-wide and began designing and constructing their own facility. *Id.* Defendant Juvenex Ltd. was incorporated in September 2000 for the purpose of operating the new spa, which opened for business sometime in 2002.[3] *Id.* at 5.

Modiri and Yipak chose the name Juvenex by combining the word "rejuvenate," meaning "make youthful," with the Persian word for blossom, phonetically spelled as "javunex." *Id.* They initially created the word "rejuvenex," but because Yipak believed her Korean clientele would have difficulty pronouncing the prefix "re," they shortened the name to Juvenex. *Id.* Modiri and Yipak spent two years on the design and construction of the spa, a female-only facility which combines Asian, European, and American elements. *Id.* The Juvenex "water and star" logo is featured at the spa and on its website, brochures, and business cards. *Id.* at 6. The "focal point" and "centerpiece" of the Juvenex facility is a thermal Jade Igloo, made from nearly twenty tons of jade boulders transported from Korea. *See* Katz Decl. at Exh. H. In addition to this jade sauna, customers may use the Herbal Glass Steam Room, Baked Clay Sauna, or soaking ponds filled with Japanese sake, algae or ginseng. Def. Mem. at 6. The spa offers facials, seaweed wraps, mud wraps, other specialty treatments, and massage, including reflexology, hydrotherapy massage, Thermo–Stone massage, and scalp massage.[4] *Id.* Treatments range in price from $50 to $495, and visitors are personally greeted by Yipak and Modiri. *Id.* at 7. Unlike Juva MediSpa, Juvenex does not offer physician-formulated or physician-supervised treatments, nor does it sell any products under a Juvenex brand name. *Id.* at 6–7.

### III. ANALYSIS

#### A. Legal Standard

■ The Lanham Act, 15 U.S.C. § 1051 *et seq.*, imposes civil liability upon parties who "use in commerce any reproduction,

---

**3.** Juvenex does not indicate the date that it opened for business, but based on the parties' submissions, it opened sometime between April 2002 and September 2002.

**4.** Juvenex's menu of services is available at *www.juvenexspa.com/menuservices.html.*

counterfeit, copy, or colorable imitation of a registered mark" in a manner that is "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1). Likelihood of confusion is the " 'keystone' for injunctive relief" under the Lanham Act. *Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,* 433 F.2d 686, 705 (2d Cir.1970), *cert. denied,* 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971) (citation omitted). A party alleging trademark infringement and unfair competition must demonstrate that "an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused, as to the source of the goods in question." *Mobil Oil Corp. v. Pegasus Petroleum Corp.,* 818 F.2d 254, 256 (2d Cir.1987) (*quoting Mushroom Makers, Inc. v. R.G. Barry Corp.,* 580 F.2d 44, 47 (2d Cir.1978)).

 "To obtain a preliminary injunction, [a plaintiff] must establish: '(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly' in its favor." *TCPIP Holding Co. v. Haar Communications, Inc.,* 244 F.3d 88, 92 (2d Cir.2001) (*quoting Federal Express Corp. v. Federal Espresso, Inc.,* 201 F.3d 168, 173 (2d Cir.2000)); *Hasbro, Inc. v. Lanard Toys, Ltd.,* 858 F.2d 70, 73 (2d Cir.1988). "In Lanham Act cases such as this one, where the plaintiff has a protected mark, 'a showing of likelihood of confusion establishes both a likelihood of success on the merits and irreparable harm.'" *New Kayak Pool Corp. v. R & P Pools, Inc.,* 246 F.3d 183, 185 (2d Cir.2001) (*quoting Hasbro,* 858 F.2d at 73); *Federal Express,* 201 F.3d at 174 (proof of likelihood of confusion creates presumption of irreparable harm). However, if plaintiffs fail to show a likelihood of success on the merits, they must make "an independent showing of likely irreparable harm." *Id.*

 The Second Circuit has established an eight-factor test for determining whether there is a likelihood of confusion. Under this test, a plaintiff's chance of success on the merits is measured by the following variables: (1) the strength of plaintiff's mark; (2) the degree of similarity between the two marks; (3) the proximity of the products and services; (4) the likelihood that the prior owner will bridge the gap between the two markets by offering a product like defendant's; (5) evidence of actual confusion; (6) whether defendant adopted its own mark in good faith; (7) the quality of defendant's product; and (8) the sophistication of the buyers. *See Polaroid Corp. v. Polarad Elecs. Corp.,* 287 F.2d 492, 495 (2d Cir.1961); *accord New Kayak Pool Corp.,* 246 F.3d at 185; *Federal Express,* 201 F.3d at 171–72 (citations omitted); *Mobil Oil Corp.,* 818 F.2d at 256. A judge must engage in deliberate review under each factor, and no single factor is more important than the rest. *See New Kayak Pool Corp.,* 246 F.3d at 185; *Arrow Fastener Co. v. Stanley Works,* 59 F.3d 384, 400 (2d Cir.1995); *Thompson Med. Co. v. Pfizer, Inc.,* 753 F.2d 208, 214 (2d Cir.1985).

### B. Likelihood of Success on the Merits

 Juva argues that Juvenex is using at least a "colorable imitation" of Juva's federally-registered marks without its consent, and further asserts that the existence of Juvenex is likely to cause confusion in violation of 15 U.S.C. § 1114(1). Pl. Mem. at 8. Juva contends that the *Polaroid* factors weigh in its favor and that consumers are likely to be confused into believing that Juvenex has "some connection" with Juva. *Id.* at 9–15. Furthermore, Juva asserts that the Juvenex name will create "initial

interest confusion," which constitutes infringement under Second Circuit precedent even if a consumer realizes the true source of a product or service prior to purchasing it. *Id.* at 9, 15–17.

Juvenex contends that plaintiffs have not shown a likelihood of success on the merits of their trademark infringement and unfair competition claims. It argues that the *Polaroid* factors do not weigh in Juva's favor because: (1) the Juva mark is weak, given the existence of many other marks with "juv" in their names; (2) the two marks are dissimilar; (3) the services and products are different because the Juva MediSpa combines medical services with spa treatments, unlike defendants' spa; (4) the fact that both parties operate spas is not enough to show that Juva will bridge the gap between the two; (5) there has been no actual confusion; (6) defendants adopted the Juvenex name and mark in good faith and were not aware of Juva MediSpa at the time they adopted it; (7) Juvenex's services are of the highest quality; and (8) the parties' clientele are sophisticated and likely to exercise a degree of care in choosing services, including the medical treatments offered by plaintiffs. *See* Def. Mem. at 8–20.

Upon review of the record, the Court finds that factors 1, 3, and 4 weigh in Juva's favor; factor 5 is neutral; and factors 2, 6, 7, and 8 weigh in favor of Juvenex. On balance, and for the reasons following, the Court finds that Juva has not sustained its burden of demonstrating a likelihood of confusion.

**1. Strength of the Juva Mark**

The strength of a mark is reflected in its distinctiveness, that is, its "tendency to identify the goods sold under the mark as emanating from a particular ... source." *Hasbro*, 858 F.2d at 76 (*quoting McGregor–Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir.1979), *overruled on other grounds by Bristol–Myers Squibb Co. v. McNeil–P.P.C. Inc.*, 973 F.2d 1033, 1043–44 (2d Cir.1992)). As an initial matter, the Court must determine whether Juva is entitled to protection under section 43(a) of the Lanham Act, and must (1) classify the mark by its inherent degree of strength, and (2) assess its strength in the marketplace. *BigStar Entertainment, Inc. v. Next Big Star, Inc.*, 105 F.Supp.2d 185, 192 (S.D.N.Y.2000); *see also McGregor–Doniger*, 599 F.2d at 1131–33; *accord Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 743–44 (2d Cir.1998).

The four categories for the inherent strength of a mark are, in ascending order of distinctiveness: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *See Hasbro*, 858 F.2d at 73 (*citing Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir.1976)). As one commentator has explained, "the word 'apple' would be arbitrary when used on personal computers, suggestive when used in 'Apple–A–Day' on vitamin tablets, descriptive when used in 'Tomapple' for combination tomato-apple juice and generic when used on apples." *BigStar*, 105 F.Supp.2d at 195 (*quoting* 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11:71, 11–120 (4th ed.1999)). A term that is generic does not distinguish a product's identity, and therefore, is not entitled to protection under the Lanham Act. *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Committee*, 483 U.S. 522, 532 n. 7, 107 S.Ct. 2971, 97 L.Ed.2d 427 (1987) (*citing* §§ 2, 14(c), 15 U.S.C. §§ 1052, 1064(c)). A descriptive term describes and immediately conveys a product's qualities or its purpose. *Centaur Communications Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1220 (2d Cir.1987), *overruled on other grounds by Bristol–*

*Myers Squibb*, 973 F.2d at 1043–44 ("Marketing Week" found to be descriptive of an advertising magazine); *Hasbro*, 858 F.2d at 73. A descriptive mark generally is not entitled to protection without proof that it has acquired secondary meaning. *Id.* Secondary meaning is established when the mark has become identified in the public mind with the producer of the goods, rather than with the goods alone. *Centaur*, 830 F.2d at 1221.

A mark that is suggestive "requires imagination, thought and perception to reach a conclusion as to the nature of the goods." *Hasbro*, 858 F.2d at 73–75 (*quoting Stix Prods., Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479, 488 (S.D.N.Y.1968)) (holding that the term "GUNG–HO" was suggestive, not descriptive, of a marine action figure); *see, e.g.,* *Playboy Enterprises, Inc. v. Chuckleberry Publishing, Inc.*, 687 F.2d 563, 566–67 (2d Cir.1982) (finding the term "PLAYBOY" to be suggestive; although it "may signify the aspirations of PLAYBOY's readership, it does not describe the product or its contents"). A suggestive mark is recognized as inherently distinctive and deserving of protection, and is not required to have established secondary meaning in the market. *Hasbro*, 858 F.2d at 73. However, "a finding of suggestiveness does not guarantee ... that the mark is a strong one." *W.W.W. Pharm. Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir.1993), *limited on other grounds by Deere & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 46 (2d Cir.1994); *accord Streetwise Maps*, 159 F.3d at 744. Even if the Court finds a mark to be suggestive, it must still consider its distinctiveness in the market. *Id.* Finally, arbitrary and fanciful terms "bear[ ] little or no relationship to the kind of product represented." *Gruner + Jahr USA Publishing v. Meredith Corp.*, 991 F.2d 1072, 1075 (2d Cir.1993). "An arbitrary term is one

that has a dictionary meaning—though not describing the product—like IVORY for soap. A fanciful mark is a name that is made-up to identify the trademark owner's product like EXXON for oil products and KODAK for photography products." *Id.* at 1075–76.

Here, the word "Juva" by itself has no dictionary meaning, nor does it describe a health and beauty spa. Therefore, the Court must determine whether the mark is suggestive or fanciful. In either case, this federally-registered mark is entitled to protection without proof of secondary meaning. *Hasbro*, 858 F.2d at 73. Juva argues that its mark is entitled to the greatest level of protection because the Juva name and marks are made-up, fanciful and strong, and the fact that the Juva marks are federally registered reinforces their distinctiveness.

The prefix "juv" appears in words derived from the Latin "juvenis," meaning "youth," including "rejuvenate" and "juvenile." Therefore, the term "Juva" can be said to bear some relationship to the rejuvenating qualities associated with a spa. Connecting the name to the spa services requires imagination, but the Juva mark is not sufficiently fanciful to be classified as such. Therefore, the Court finds the mark to be suggestive, and while it is not accorded the maximum degree of protection under the trademark laws, the mark is nonetheless inherently distinctive and strong.

However, the inquiry into strength of the Juva mark does not end with this determination. In addition to inherent distinctiveness, the Court must consider the mark's strength in the marketplace. *Streetwise Maps*, 159 F.3d at 743–44. Even a fanciful mark's strength can be undercut by evidence that it lacks distinctiveness in the market. *Id.* at 744. Third party uses of similar marks can be evidence of weakness because consumers

have been so exposed to other marks similar to the plaintiff's so as to help them distinguish between such marks "on the basis of minute distinctions." McCarthy on Trademarks and Unfair Competition at § 11:88 (4th ed.2003) (*quoting Standard Brands, Inc. v. RJR Foods, Inc.*, 192 U.S.P.Q. 383, 386, 1976 WL 21135 (T.T.A.B.1976)); *see also Lang v. Retirement Living Publ'g Co.*, 949 F.2d 576, 581 (2d Cir.1991) (extensive third-party use of part of plaintiff's trade name weighed against finding that mark was strong); *Trustees of Columbia University v. Columbia/HCA Healthcare Corp.*, 964 F.Supp. 733, 744 (S.D.N.Y.1997) (the distinctiveness of "Columbia" mark in healthcare industry was diluted by third party use, and therefore, the mark lacked strength) (*citing Lever Bros. Co. v. American Bakeries Co.*, 693 F.2d 251, 256 (2d Cir.1982)).

Juvenex argues that even if Juva's mark is suggestive, it is not entitled to protection because there are many third party marks using the letters "juv" in connection with "rejuvenating" products. Juvenex has listed the following such marks which are federally registered and refer to health or beauty products: JUVENTUS (body soaps and other personal products), JUVIS (perfumes, skin and massage creams, essential oils, nail and hair products), JUVENANCE (skin products), JUVELLA (skin creams and perfumes), JUVENA (bath salts, skin cream and lotion, beauty products), JUVIAND (pharmaceuticals for female hormonal dysfunction), JUVRIM (pharmaceutical preparations for cardiovascular illnesses), JUVATONE (dietary supplements), JUVANTIA (pharmaceutical preparations for central nervous disorders), NUJUVENIS (herbal and dietary supplements), PRO–JUVENATE (dietary supplements), JUVEN (same), JUVENTUS FOREVER (same), JUVAMINE (pharmaceutical food supplements), and JUVELON (multi-vitamin preparation). Def. Mem. at 10–11. Juvenex argues that because Juva's mark identifies its skin preparations, creams, hair growth stimulants, and other body and beauty products, its mark has been weakened by the other "juv" marks used in connection with "rejuvenating" goods and services.

 Juvenex, however, does not provide evidence that the above-listed marks are currently in use or are sold in conjunction with spa services. "The significance of third-party trademarks depends wholly on their usage." *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1173 (2d Cir.1976). The mere existence of other trademarks, without evidence that they are actually in use, does not indicate that a mark has been weakened in the marketplace. *Id.; accord Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F.Supp.2d 271, 281 (S.D.N.Y.1998); *Elizabeth Taylor Cosmetics Co. v. Goutal*, 673 F.Supp. 1238, 1244 (S.D.N.Y.1987). Therefore, without further evidence that the aforementioned marks "compete either in quality, price, or location with [Juva,]" *Elizabeth Taylor*, 673 F.Supp. at 1245, the Court cannot conclude that the mark has been weakened. Accordingly, this factor weighs in Juva's favor.

## 2. Similarity Between the Two Marks

 In determining whether two marks are confusingly similar, the Court must assess the marks in the context in which purchasers see them and "appraise 'the overall impression created by [them.]'" *Streetwise Maps*, 159 F.3d at 744 (*quoting Gruner*, 991 F.2d at 1078). The fact that a junior user's mark might call to mind the senior user's mark is not sufficient for a likelihood of confusion. *Hutchinson v. Essence Communications,*

*Inc.,* 769 F.Supp. 541, 556 (S.D.N.Y.1991) (no actual confusion where junior user's mark caused customer to "think about" senior user's same name); *Original Appalachian Artworks, Inc. v. Streeter,* 3 U.S.P.Q.2d 1717, 1718, 1987 WL 124306 (T.T.A.B.1987) (even if the "Corn Patch Pigs" name of stuffed animals brings to mind "Cabbage Patch Kids," no likelihood of confusion is established). "The examination of the similarity of the trademarks ... does not end with a visual comparison of the marks ... Similarity of sound also enters into the calculation of likelihood of confusion." *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons,* 523 F.2d 1331, 1340 (2d Cir.1975). Additionally, even where two marks are similar in content and sound, differences in the parties' use of the marks weighs against a likelihood of confusion. *See Federal Express,* 201 F.3d at 172 (affirming district court's finding that parties' different uses of marks, including different logos, outweighed similarities between FEDERAL EXPRESS and FEDERAL ESPRESSO). The "size, layout, design, and logotype of the two titles" can reduce the potential for confusion. *Centaur,* 830 F.2d at 1226 (*quoting C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.,* 753 F.2d 14, 18 (2d Cir.1985)).

The Court has considered various aspects of the Juva and Juvenex marks, including their appearance, sound, and use, and finds that the differences between them outweigh any likelihood of confusion. As an initial matter, the words Juva and Juvenex do not have any inherent meaning to be compared, but both suggest rejuvenation in the context of the spa services they represent. While both words are pronounced with emphasis on the first syllable "Juv," they otherwise are obviously different words. Plaintiffs argue that Ju-

venex sounds like "Juva Next" or "Juva Annex," implying a direct affiliation with Juva Medi Spa. However, phonetic similarity is not dispositive in creating a likelihood of confusion, and is outweighed where, as here, the marks differ extensively in their use and appearance. *See Federal Express, supra.*

An especially distinguishing factor is that the Juva mark is never used alone in referring to the plaintiffs' health and beauty spa. It is always displayed in conjunction with the word "MediSpa," including on its website's introduction to spa services.[5] In telephone books and on websites such as *www.spafinder.com* and *www.splendora.com,* plaintiffs' spa is listed as "Juva Medi Spa," in contrast to defendants' "Juvenex Spa." If one searches these websites for "Juva," information about "Juvenex" is not generated. Because plaintiffs' spa is always presented to consumers as a "MediSpa," customers are reminded of the medical component to treatments, a factor which distinguishes it from Juvenex Spa. Additionally, the Juva logo on plaintiffs' brochures and website is quite distinct from Juvenex's "water and star" logo. Juva is printed in large, capital letters with a leaf design across the last letter. Juvenex's logo includes the name in small, lowercase letters with some ornamentation, and a design of a star with rays, one of which resembles water. The Court finds that the two marks are not confusingly similar in the overall impression they create, in light of the context in which such marks appear. Therefore, this factor weighs against a preliminary injunction.

### 3. Competitive Proximity of the Products

■■■■ In assessing this factor, the Court must determine whether the two

5. *See www.juvaskin.com/medispa/medispa bo-* *dytxt.jsp.*

products compete in the same market. *Streetwise Maps*, 159 F.3d at 745. The purpose here is to determine "whether 'it is likely that customers mistakenly will assume either that [the junior user's goods] somehow are associated with [the senior user] or · are made by [the senior user].'" *Centaur*, 830 F.2d at 1226 (*quoting Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 874 (2d Cir. 1986)). In determining competitive proximity, courts consider factors such as appearance, function, advertising orientation, and price. *Jordache Enterprises*, 841 F.Supp. at 517. Courts have noted, however, that "direct competition between the products is not a prerequisite to relief ... [T]he likelihood of confusion, not competition, is the real test of trademark infringement." *Mobil Oil Corp.*, 818 F.2d at 257–58 (*quoting Continental Motors Corp. v. Continental Aviation Corp.*, 375 F.2d 857, 861 (5th Cir.1967)). Competitive proximity is also to be measured in light of the first two *Polaroid* factors – the stronger the mark and the greater the similarity between the two marks, the broader protection it deserves. *Id.* at 258.

Both Juva and Juvenex use their marks in the spa industry, and charge comparable prices for services. Plaintiffs argue that Juvenex's services are identical to those at Juva MediSpa, pointing out that they both offer anti-oxidant facials, .body scrubs or wraps, cellulite treatments, and massages (including shiatsu, sports .massage and reflexology). Pl. Repl. at 5–6. Nonetheless, the Court notes that the two spa facilities differ in a number of respects. Although Juva's medical facility offers separate services from the day spa, its spa treatments are still medically for-

mulated and supervised, and thus it caters to a different type of clientele. Unlike Juvenex, Juva MediSpa offers laser facials, medical-grade skin peels,· and laser hair removal, and utilizes its Juva brand skin care products. In contrast, the information available to consumers about Juvenex emphasizes that treatments are derived "from the Far East and beyond," [6] and that Korean and Japanese elements are a major part of the spa's services. For example, its keystone is the Jade Igloo made from jade boulders imported from Korea. The spa has no medical emphasis, nor does it sell hair and beauty products under its own name and mark.

Despite the differences between the two spas, the Court nonetheless finds that Juva MediSpa and Juvenex are sufficiently proximate in the marketplace to tip this factor in Juva's favor, given that they both operate day spas in New York City. However, the conspicuous differences between the marks, and the fact that consumers can easily distinguish them, ultimately will forestall any probability of confusion resulting from the spas' competitive proximity.

### 4. Likelihood that Juva Will Bridge the Gap

 This *Polaroid* factor serves to protect the senior user's interest in entering the market occupied by the junior user at some point in the future. *Jordache Enterprises*, 841 F.Supp. at 517 (*citing Lois Sportswear*, 799 F.2d at 874). If a trademark owner intends to enter the same market as the defendant, "such a showing is indicative of future likelihood of confusion as to source." *Id.* Here, it appears that although Juva and Juvenex are

---

**6.** *See www.juvenexspa.com/intro page.html.* Juvenex's Asian characteristics are the focus of press releases and reviews. *See* Katz Decl. at Exh. G ("ancient Asian remedies," "Korean bathhouse," "Asian purification," etc.); Modiri Decl at Exh. 2 ("Koreatown oasis," "Japanese soaking tubs," etc.).

in competitive proximity, they cater to different segments of the spa clientele. Insofar as they are different, Juva has not evidenced any intention of bridging the gap between them. To do so, Juva MediSpa would have to adopt, for example, the emphasis of Juvenex's spa on Asian remedies and purification, such as the jade sauna and the Japanese soaking pools. Juva is also not likely to discontinue the medical emphasis of its spa treatments. However, given the Court's determination that the two parties are in competitive proximity in the marketplace, it is unnecessary for Juva to bridge existing differences. Accordingly, this factor favors Juva.

### 5. Actual Confusion

■ Evidence of actual confusion furthers a finding of likelihood of confusion. *See Mobil Oil Corp.*, 818 F.2d at 259 (citing *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir.1971)). Here, Juva concedes that there is no evidence of actual confusion. Juvenex criticizes the fact that Juva did not attempt to procure any such evidence through consumer surveys. Proof of actual confusion, although strong evidence of trademark infringement, is not required in an action seeking injunctive relief under the Lanham Act. *Resource Developers, Inc. v. Statue of Liberty–Ellis Island Found., Inc.*, 926 F.2d 134, 139 (2d Cir. 1991). The absence of evidence of actual confusion is less significant when the two marks have co-existed for a relatively short time period, as is the case here. *Centaur*, 830 F.2d at 1227 (marks co-existed for four months); *Hasbro*, 858 F.2d at 78. Accordingly, this factor weighs neither for nor against a preliminary injunction.

### 6. Juvenex's Good Faith

■ This factor considers "whether defendants 'adopted [their] mark with the intention of capitalizing on plaintiff's reputation and goodwill and any confusion between [their] and [plaintiff's] product.'" *Streetwise Maps*, 159 F.3d at 745 (quoting *Lang*, 949 F.2d at 583). A junior user who intentionally copied a senior user's mark thereby "intended to create a confusing similarity of appearance and will be presumed to have succeeded." *Perfect Fit Indus., Inc. v. Acme Quilting Co.*, 618 F.2d 950, 954 (2d Cir.1980); accord *Bristol–Myers Squibb*, 973 F.2d at 1044. Here, the parties dispute whether Juvenex adopted its name in good faith. Juva contends that Juvenex had constructive knowledge of its names and marks beginning on November 18, 1998, when Juva filed the first of its three applications with the USPTO. Furthermore, Juva argues that because Dr. Katz made defendants aware of the Juva mark before opening the Juvenex Spa, they proceeded in bad faith.

■ While Juva acted as a responsible trademark owner in being alert to possible confusion of similar names, evidence of Juvenex's bad faith is lacking. Even if Juvenex had both actual and constructive notice of Juva's marks, this does not necessarily demonstrate bad faith. *Edison Bros. Stores, Inc. v. Cosmair, Inc.*, 651 F.Supp. 1547, 1560 (S.D.N.Y.1987); accord *McGregor–Doniger*, 599 F.2d at 1137. "Defendants' failure to perform an official trademark search, even with the knowledge [of plaintiffs' mark], does not standing alone prove that they acted in bad faith." *See Streetwise Maps*, 159 F.3d at 746. Furthermore, "[s]election of a mark that reflects the product's characteristics ... support[s] a finding of good faith." *Lang*, 949 F.2d at 583. Defendants contend that Modiri and Yipak created the Juvenex name to reflect the rejuvenating qualities of the spa, as it combines the Persian word "javunex," meaning blossom,

with "rejuvenate." Def. Mem. at 4, 17. They also assert that they invested in the Juvenex name through promotional and business materials, and proceeded to open the spa because of their good faith belief that the Juvenex name did not infringe Juva's mark and that the differences between the two marks were obvious. *Id.* at 5–7. The Court finds no indication that Juvenex intended to capitalize on the goodwill of Juva. Accordingly, this factor weighs in defendants' favor.

### 7. Quality of Juvenex's Product

■ "Quality of product is distinct from competitiveness ... [and] is weighed as a factor where there is an allegation that a low quality product is taking unfair advantage of the public good will earned by a well-established high quality product." *Gruner*, 991 F.2d at 1079. Juva has no evidence that Juvenex's services are inferior in quality, but notes that (1) Juvenex does not employ physicians to oversee clients and formulate treatments, and (2) Juvenex promotes itself as an "all-night" spa where people can go to "cure hangovers." Pl. Mem. at 13; Pl. Repl. at 9. However, the presence of on-site physicians does not necessarily render Juva MediSpa to be of higher quality than Juvenex Spa. Rather, Juva MediSpa has a different emphasis to its spa treatments as a result of operating both a medical facility and day spa. A difference in types of services does not necessarily evidence a difference in quality. In fact, the reviews of Juvenex submitted by Juva only praise the quality of Juvenex's facility. *See* Katz Decl. at Exhs. G–H. Accordingly, this factor weighs in defendants' favor.

### 8. Sophistication of Consumers

■ "Likelihood of confusion must be assessed by examining the level of sophistication of the relevant purchasers."

*W.W.W. Pharm. Co.*, 984 F.2d at 575. Purchasers of small or inexpensive products, such as lip balm or pasta, "are considered casual purchasers prone to impulse buying[,]"and thus are unsophisticated. *Id.; see also Patsy's Brand, Inc. v. I.O.B. Realty, Inc.*, 317 F.3d 209, 219 (2d Cir. 2003). By contrast, consumers purchasing jeans and perfume, for example, have been found to be sophisticated and unlikely to be confused by similar marks. *Lois Sportswear*, 799 F.2d at 875; *Nina Ricci, S.A.R.L. v. Gemcraft Ltd.*, 612 F.Supp. 1520, 1529 (S.D.N.Y.1985). "The more sophisticated the consumers, the less likely they are to be misled by similarity in marks." *TCPIP Holding Co.*, 244 F.3d at 102.

Here, potential purchasers of Juva's spa services will spend between $50 and $650 for treatments. Such consumers are likely to exercise a great deal of care in selecting a spa facility, not simply because of cost, but because such treatments affect their physical appearance and health. Those who are seeking medically-supervised treatments are likely to pay attention in making sure they have chosen the correct facility. The presence of Dr. Katz and the medically-formulated treatments are the distinguishing features of Juva MediSpa. If a potential customer who had heard of Juva MediSpa and Dr. Katz, walked past Juvenex Spa in Korea Town or saw it on the Internet, that person would see no indication from the sign or from any advertisements that Juvenex operated a "MediSpa," that Dr. Katz was in any way affiliated with it, or that Juva's products were sold there. Even a relatively unsophisticated consumer could recognize obvious differences between the two names, whether seeing one or both names in print or hearing them spoken. Consumers who look in the telephone book or perform an internet search on *www.spafinder.com* will see both spas listed and realize that they

are two different spas in separate locations. Juva argues that because the two spas are only two miles apart, confusion is even more likely. However, in Manhattan, consumers can observe a stark difference between the Korea Town location of Juvenex and Juva's address in the East 50's near Madison Avenue, and they will not be confused by the spas' physical proximity. The Court finds that this factor weighs definitively in defendants' favor.

### 9. Initial Interest Confusion

■ Confusion can occur if "potential consumers initially are attracted to the junior user's mark by virtue of its similarity to the senior user's mark, even though these consumers are not actually confused at the time of purchase." *Jordache Enterprises*, 841 F.Supp. at 514–15. Such initial interest confusion is sufficient to infringe a trademark. *See Mobil Oil Corp.*, 818 F.2d at 260. In *Grotrian, Helfferich, Schulz, Th. Steinweg Nachf v. Steinway & Sons*, 365 F.Supp. 707, 717 (S.D.N.Y.1973), the district court found that where potential purchasers of Steinway pianos were initially interested in Grotrian–Steinweg pianos, the value of Steinway's trademark could be harmed. Thus, there was a likelihood of confusion, notwithstanding the sophistication of consumers. The Second Circuit affirmed, finding that potential or actual confusion at the time of purchase is not required, and explaining that "[t]he harm to Steinway ... is the likelihood that a consumer, hearing the 'Grotrian–Steinweg' name and thinking it had some connection with 'Steinway,' would consider it on that basis." *Grotrian*, 523 F.2d at 1342 (2d Cir.1975).

Juva is concerned that the similarity between its mark and Juvenex will cause potential customers of Juva MediSpa to be diverted to Juvenex, believing that the two are somehow affiliated. *See* Pl. Mem. at 15–16. However, potential customers are likely aware that there are numerous spas in New York City, and where two spas' names contain "juv," which is easily associated with "rejuvenation," they will not necessarily be diverted to Juvenex. If consumers who have heard of Juva MediSpa see an advertisement for Juvenex, the fact that Juvenex does not hold itself out as a "MediSpa" with on-site physicians will help to forestall any confusion. Furthermore, consumers seeking medically-administered spa treatments are not likely to casually schedule an appointment without inquiring further into the spa's services. Because purchasers of spa treatments will exercise greater caution and attention with regard to services affecting their physical appearance and well-being, the risk of initial interest confusion is not sufficient to create a likelihood of confusion.

### 10. Balancing of *Polaroid* Factors

On balance, the Court finds that Juva has not prevailed in showing a likelihood of success on the merits of its trademark infringement claim, given the obvious differences between the two marks, the lack of evidence that Juvenex adopted its name in bad faith or that its product is inferior in quality, and the fact that ordinary consumers are sophisticated enough to distinguish them. Such considerations outweigh the fact that the Juva mark is inherently distinctive and that the two marks compete in the same general industry. In addition, Juva has not demonstrated the likelihood that consumers will be initially interested in Juvenex under a mistaken belief that the two spas are affiliated.

### C. Juva's Remaining Claims

### 1. Unfair Competition and other Trademark Infringement Claims

■ Juva's federal claims for unfair competition and false designation of origin,

as well as state law trademark infringement and unfair competition claims, also fail for the reasons outlined above. Both common-law and federal statutory trademark infringement claims are assessed under the likelihood of confusion standard. *See Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992) (liability under § 43(a) of Lanham Act "requires proof of likelihood of confusion"); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 543, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (N.Y.1977) (test under New York law is the same as that applied under the Lanham Act); *see also Invicta Plastics (USA) Ltd. v. Mego Corp.*, 523 F.Supp. 619, 625 (S.D.N.Y.1981) (same analysis applies to a claim under the false designation of origin provision of the Lanham Act protecting unregistered trademarks). In addition, state and federal unfair competition claims are evaluated under the likelihood of confusion standard. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 109 S.Ct. 971, 103 L.Ed.2d 118 (1989) (the "general concern" behind unfair competition law is "protecting *consumers* from confusion as to source") (emphasis in original); *Jordache Enterprises, Inc. v. Levi Strauss & Co.*, 841 F.Supp. 506, 514, n. 9 (S.D.N.Y.1993) (federal unfair competition claims are assessed under same standard as trademark infringement claims); *Allied Maintenance Corp.*, 42 N.Y.2d at 543, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (in action under New York law for unfair competition, the key is likelihood of confusion).

## 2. State Law Dilution Claim

■■■■ Juva brings a claim under New York's anti-dilution statute, Section 360–*l* of the General Business Law, which provides that:

Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

N.Y. Gen. Bus. Law § 360–*l* (McKinney 2003) (formerly § 360–d).

■■■■ New York's anti-dilution statute provides broader protection than trademark and unfair competition laws. *Allied Maintenance Corp.*, 42 N.Y.2d at 544, 399 N.Y.S.2d 628, 369 N.E.2d 1162. It is "designed to prevent . . . the gradual whittling away of a firm's distinctive trademark or name." *Id.* To establish a dilution claim under New York law, a plaintiff must establish (1) ownership of a distinctive mark capable of being diluted and (2) likelihood of dilution. *Id.; Hormel Foods Corp. v. Jim Henson Productions, Inc.*, 73 F.3d 497, 506 (2d Cir.1996); *Revlon Consumer Prods. Corp. v. Jennifer Leather Broadway, Inc.*, 858 F.Supp. 1268, 1277 (S.D.N.Y.1994). Likelihood of confusion is not necessary to prevail on a state law dilution claim. *Federal Express*, 201 F.3d at 175. The Court has already determined that Juva is a suggestive mark and thus distinctive, and therefore, must determine only the likelihood of dilution. "Dilution can consist either of blurring or tarnishment of [plaintiff's] mark." *Sports Authority, Inc. v. Prime Hospitality Corp.*, 89 F.3d 955, 966 (2d Cir.1996). Juva has not identified which type of dilution it claims has occurred.

### a. Blurring

■■■■ "[D]ilution by 'blurring' may occur where the defendant uses or modifies the plaintiff's trademark to identify the defendant's goods and services, raising the possibility that the mark will lose its

ability to serve as a unique identifier of the plaintiff's product." *Hormel Foods,* 73 F.3d at 506 (*quoting Deere & Co.,* 41 F.3d at 43 (2d Cir.1994)). "The legislative history of section 368-d underscores this understanding by giving examples of hypothetical violations: 'DuPont shoes, Buick aspirin tablets ... Kodak pianos, Bulova gowns, and so forth.'" *Id.* (*quoting* 1954 N.Y. Legis. Ann. 49–50). The likelihood of blurring is generally assessed by a six-factor test: (1) similarity of the marks, (2) similarity of the products covered, (3) sophistication of the consumers, (4) predatory intent, (5) renown of the senior mark, (6) renown of the junior mark. *Deere & Co.,* 41 F.3d at 43–44, n. 8; *accord Sports Authority,* 89 F.3d at 966. Based on the Court's foregoing analysis, Juva is not likely to succeed with respect to factors 1, 3, or 4. The two marks are in competitive proximity, although the Court has noted several differences between the products. Furthermore, the examples of blurring cited in the legislative history of the statute are not relevant to this case in which Juvenex has adopted a different name from plaintiff's mark. The Court is unable to conclude that Juva is likely to succeed under this theory of dilution.

#### b. Tarnishment

Tarnishment occurs when the trademark "is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context, with the result that the public will associate the lack of quality or lack of prestige in the defendant's goods with the plaintiff's unrelated goods ... The mark may also be tarnished if it loses its ability to serve as a wholesome identifier of plaintiff's product." *Hormel Foods,* 73 F.3d at 507 (*quoting Deere & Co.,* 41 F.3d at 43 (2d Cir.1994)) (internal quotations omitted). "The sine qua non of tarnishment is a finding that plaintiff's mark will suffer negative associations through

defendant's use." *Id.* There is no evidence here that Juvenex's product is inferior in quality or that it will cause the Juva mark to be tarnished by negative associations. Accordingly, Juva is not likely to succeed ·on this theory of dilution.

#### D. Irreparable Harm and Balance of Hardships

Because the Court has not found a likelihood of success on the merit, Juva is not entitled to a presumption of irreparable harm. *Federal Express,* 201 F.3d at 174. Juva has made no independent showing of irreparable harm, and therefore, its claim for a preliminary injunction must fail. *Id.* Accordingly, it is not necessary for the Court to examine whether Juva has demonstrated a balance of hardships tipping in its favor, or a sufficiently serious question going to the merits.

### IV. CONCLUSION

For the foregoing reasons, the Court hereby orders that Juva's motion for a preliminary injunction be **DENIED**.